**COLORADO INSURANCE GUARANTY ASSOCIATION, Plaintiff–Appellant,**

v.

**Michael L. MENOR, Defendant–Appellee.**

No. 05CA2483.

Colorado Court of Appeals, Div. II.

May 3, 2007.

McCrea & Buck, LLC, Bruce B. McCrea, Brett R. Parnes, Denver, Colorado, for Plaintiff-Appellant.

Buescher Goldhammer Kelman & Dodge, P.C., Shelley P. Dodge, Denver, Colorado; Law Office of G. Michael Schuyler, P.C., G. Michael Schuyler, Greenwood Village, Colorado, for Defendant-Appellee.

Opinion by Judge LOEB.

Plaintiff, Colorado Insurance Guaranty Association (CIGA), appeals the judgment of the district court dismissing its complaint against defendant, Michael L. Menor, pursuant to C.R.C.P. 12(b). We reverse and remand for further proceedings on CIGA's complaint.

In 1997, Menor, who was employed by Sunstate Equipment, was driving in a vehicle owned and insured by Sunstate, when a vehicle driven by an uninsured motorist veered out of control and into the path of Menor's vehicle, severely injuring him.

Menor filed for workers' compensation benefits under Sunstate's insurance policy with Industrial Indemnity Company, and Industrial admitted liability for such benefits. In 2002, Fremont Indemnity Company, which had acquired Industrial and had succeeded to its obligations under the workers' compensation policy, filed a final admission for liability (FAL) for permanent total disability benefits and medical benefits.

In 2003, Fremont became insolvent. Pursuant to the Colorado Insurance Guaranty Association Act, § 10–4–501, et seq., C.R.S. 2006 (the Act), CIGA assumed responsibility for the claim and continued to pay workers'

compensation benefits to Menor thereafter. See Alexander v. Indus. Claim Appeals Office, 42 P.3d 46, 47 (Colo.App.2001) ("CIGA is a nonprofit, unincorporated legal entity created by the [Act] ... to create a means for insureds to recover on claims against insolvent insurers.... CIGA steps into the shoes of the insolvent insurer to pay claims within the coverage and limits of the insurance policy.").

Sunstate also had an insurance policy providing uninsured and underinsured motorist (UM/UIM) coverage with St. Paul Fire and Marine Insurance Company. In 2000, Menor filed a claim with St. Paul for UM/UIM benefits because the driver whose negligence caused the accident and his injuries was uninsured. Menor and St. Paul apparently agreed to resolve that claim through arbitration. In June 2000, Menor also filed a complaint against St. Paul in the Pueblo County District Court alleging entitlement to UM/UIM benefits under the St. Paul policy.

In February 2001, Menor, Sunstate, and St. Paul entered into a settlement regarding Menor's claim under the St. Paul policy for a lump sum payment of $265,000, and periodic payments of $33,700, to be paid annually beginning in June 2012 and guaranteed to last for 20 years, until June 2031. The settlement agreement was silent as to any allocation or apportionment between economic and noneconomic damages. Also, there is no indication in the record that the settlement was submitted to the district court for approval.

In November 2003, CIGA filed a petition with the Division of Administrative Hearings to modify, terminate, or suspend workers' compensation benefits based on § 10–4–512, C.R.S.2006, the nonduplication of recovery provision of the Act. CIGA asserted entitlement to a statutory offset, pursuant to § 10–4–512(1), C.R.S.2006, that would reduce Menor's workers' compensation benefits based on his UM/UIM insurance settlement with St. Paul to the extent the settlement was for economic damages.

Following a hearing, an administrative law judge (ALJ) found that the nonduplication of recovery provision was applicable and grant-

ed CIGA's petition. However, the ALJ found that she did not have jurisdiction to determine the amount of the offset, finding instead that the "amount of offset, if any, must be determined in a *Jorgensen* hearing by the trial court in the tort case, by apportionment of economic and noneconomic damages." *See Colo. Comp. Ins. Auth. v. Jorgensen,* 992 P.2d 1156 (Colo.2000).

CIGA then filed this action in the Pueblo County District Court, pursuant to § 10–4–512, requesting a judgment that the amounts of Menor's prior settlement with St. Paul "were for economic damages, thereby eliminating CIGA's obligations to Menor for workers' compensation benefits."

Menor moved to dismiss CIGA's complaint under C.R.C.P. 12(b)(1) for lack of subject matter jurisdiction and C.R.C.P. 12(b)(5) for failure to state a claim upon which relief can be granted.

The district court granted the motion to dismiss based on lack of subject matter jurisdiction. The district court did not rule on Menor's alternative C.R.C.P. 12(b)(5) contention. This appeal followed.

## I. Subject Matter Jurisdiction

CIGA contends the district court erred in dismissing its complaint under C.R.C.P. 12(b)(1) on the ground that the court lacked subject matter jurisdiction over the case. We agree.

■ We review de novo a district court's legal conclusions on a motion to dismiss under C.R.C.P. 12(b)(1) for lack of subject matter jurisdiction. *Ashton Props., Ltd. v. Overton,* 107 P.3d 1014, 1017 (Colo.App.2004).

■ A court must have jurisdiction over the parties and the subject matter of the issue to be decided if its judgment is to be valid. *In re Marriage of Stroud,* 631 P.2d 168, 170 (Colo.1981). "Subject matter jurisdiction concerns the court's authority to deal with the class of cases in which it renders judgment." *In re Marriage of Stroud, supra,* 631 P.2d at 170.

■ Subject matter jurisdiction is defined as a court's power to resolve a dispute in which it renders judgment. *Ashton*

*Props., Ltd. v. Overton, supra.* A court has subject matter jurisdiction if "the case is one of the type[s] of cases that the court has been empowered to entertain by the sovereign from which the court derives its authority." *Horton v. Suthers,* 43 P.3d 611, 615 (Colo.2002) (quoting *Paine, Webber, Jackson & Curtis, Inc. v. Adams,* 718 P.2d 508, 513 (Colo.1986)).

■ "The Colorado Constitution vests district courts with general subject matter jurisdiction in civil cases." *Ashton Props., Ltd. v. Overton, supra,* 107 P.3d at 1017; *see* Colo. Const. art. VI, § 9(1) ("The district courts shall be trial courts of record with general jurisdiction, and shall have original jurisdiction in all civil, probate, and criminal cases, except as otherwise provided herein, and shall have such appellate jurisdiction as may be prescribed by law."). As courts of general jurisdiction, the district courts in Colorado have the authority to consider questions of law and of equity and to award legal and equitable remedies. *Paine, Webber, Jackson & Curtis, Inc. v. Adams, supra,* 718 P.2d at 513; *Ashton Props., Ltd. v. Overton, supra,* 107 P.3d at 1017.

Both CIGA and Menor agree the ALJ correctly concluded that she did not have jurisdiction to apportion the settlement among Menor, St. Paul, and Sunstate, because the UM/UIM settlement did not involve workers' compensation benefits. *Cf. MGM Supply Co. v. Indus. Claim Appeals Office,* 62 P.3d 1001, 1004 (Colo.App.2002) (ALJs have jurisdiction to decide workers' compensation cases).

CIGA relies on *Jorgensen,* a case interpreting subrogation rights under § 8–41–203, C.R.S.2006, of the Workers' Compensation Act, for the proposition that jurisdiction to review and apportion settlement proceeds lies with the court that has jurisdiction over the tort claim. *Colo. Comp. Ins. Auth. v. Jorgensen, supra,* 992 P.2d at 1160; *see* § 8–41–203 (providing that a workers' compensation insurer is subrogated to the injured claimant's rights to recover damages against a tortfeasor). Under *Jorgensen,* when a settlement involves an insurer's subrogation rights with respect to economic damages re-

covered from a tortfeasor by an injured worker pursuant to § 8–41–203, the insurer may ask the court to scrutinize the settlement, and the court may hold a hearing to apportion economic and noneconomic damages. *Colo. Comp. Ins. Auth. v. Jorgensen, supra,* 992 P.2d at 1166.

Menor contends that the Pueblo County District Court is not the tribunal that had jurisdiction over the UM/UIM insurance settlement between Menor, St. Paul, and Sunstate, because neither CIGA nor its predecessor, Fremont, participated in the settlement. Menor points out that, when Fremont filed its FAL in 2002, it made no claim of offset against the UM/UIM insurance settlement, and CIGA brought this lawsuit several years after the tort and UM/UIM claims were actually settled. Menor further asserts that the complaint he filed against St. Paul was never served and was dismissed for failure to prosecute, and that because the UM/UIM settlement was never filed with or approved by the court, the district court did not take jurisdiction over it. Menor thus argues that *Jorgensen* is distinguishable from this case, both because in *Jorgensen,* the district court that actually approved the settlement later apportioned the settlement proceeds, and because the workers' compensation insurer there had intervened in the personal injury action to protect its subrogation rights. In Menor's view, under *Jorgensen,* a district court only has the power to review a settlement for apportionment or enforce a subrogation right when the party seeking the right has been involved in the original tort claim or settlement and when proceedings involving the tort claim or settlement have already taken place in the district court.

■ We reject Menor's view as being too narrow an interpretation of the subject matter jurisdiction of district courts in Colorado, and we thus agree with CIGA that the district court had subject matter jurisdiction over this case.

Here, CIGA's complaint sought to enforce its statutory right under § 10–4–512(1) of the Act to reduce an amount payable on a covered claim to the extent it is duplicative of a recovery under Menor's UM/UIM insurance policy.

■ As a preliminary matter, we first consider whether the Act provides CIGA with a cause of action to enforce its rights under § 10–4–512(1). Although the language of that section does not expressly provide CIGA with a cause of action, we conclude that it implicitly does so.

■ Whenever a plaintiff alleges that a statute implicitly creates a private right of action, the critical question is whether the legislature intended such a result. For this reason, we will not infer a private right of action based on a statutory violation unless we discern a clear legislative intent to create such a cause of action. *Gerrity Oil & Gas Corp. v. Magness,* 946 P.2d 913, 923 (Colo. 1997).

■ When a statute does not expressly provide for a private civil remedy, a court must consider three factors in determining whether a particular plaintiff has available a private cause of action: whether the plaintiff is within a class of persons intended to be benefited by the legislative enactment; whether the legislature intended to create, albeit implicitly, a private right of action; and whether an implied civil remedy would be consistent with the purposes of the legislative scheme. *See Gerrity Oil & Gas Corp. v. Magness, supra,* 946 P.2d at 923 (concluding that there was no private cause of action under the oil and gas conservation statute because the legislature intended that a commission have primary responsibility for enforcing the statute's provisions); *Allstate Ins. Co. v. Parfrey,* 830 P.2d 905, 911 (Colo.1992)(concluding that there was a private cause of action because these three elements were met).

Here, there is no question that CIGA is the entity intended to be protected by § 10–4–512. The General Assembly expressly provided for nonduplication of recovery to conserve CIGA's resources. Further, we conclude the General Assembly, in enacting § 10–4–512, impliedly intended to create a private civil remedy for CIGA to enforce its right to reduce its payments to avoid nonduplication of recovery by insureds. In our view, the goal of providing nonduplication of

recovery would be substantially frustrated if CIGA were without a civil remedy to enforce its rights under the statute. Therefore, we conclude that the existence of a private civil remedy for CIGA to enforce the provisions of § 10–4–512 is consistent with the overall purposes of the legislative scheme as expressed in the Act.

Because Colorado district courts have general jurisdiction over civil matters except as otherwise provided, we further conclude that the district court has subject matter jurisdiction to resolve CIGA's claim. *See* Colo. Const. art. II, § 6 ("Courts of justice shall be open to every person, and a speedy remedy afforded for every injury to person, property or character; and right and justice should be administered without sale, denial or delay."); *Colo. Ins. Guar. Ass'n v. Harris*, 827 P.2d 1139 (Colo.1992)(after plaintiff and her insurance carrier had settled her UM/ UIM insurance claim out of court, CIGA filed a declaratory judgment action in district court, seeking a judicial determination of its rights and duties under § 10–4–512); *Sears v. Romer*, 928 P.2d 745, 750 (Colo.App. 1996) ("if a right does accrue under the law, the courts must be available to effectuate such rights").

Contrary to the arguments of both parties, we do not perceive that *Jorgensen* dictates the subject matter jurisdiction analysis in this case, one way or the other. *Jorgensen* concerned the proper interpretation of § 8–41–203 and a workers' compensation insurer's subrogation rights under that statute to obtain an offset against funds recovered by an injured party from a tortfeasor. Here, by contrast, CIGA seeks to assert its statutory right under § 10–4–512(1) of the Act to reduce its obligation on a covered claim to the extent of funds recovered by the injured party under another insurance policy. Although not determinative here, we agree that *Jorgensen* is a helpful analogy, to the extent it stands for the proposition that a district court, rather than a workers' compensation ALJ, has subject matter jurisdiction to apportion a settlement as between economic and noneconomic damages.

However, we reject Menor's argument that the court's jurisdiction is somehow constrained by whether CIGA previously intervened in the UM/UIM insurance settlement, or by whether a tort case or settlement had actually been filed or adjudicated in the district court. Despite the fact that CIGA stepped into the shoes of Fremont for the purpose of paying Menor's workers' compensation benefits, we discern no legal basis or reason why the district court's jurisdiction to consider CIGA's statutory claim for an offset under § 10–4–512 should be dependent on whether CIGA intervened in Menor's UM/ UIM case against St. Paul. We also see no reason, under the circumstances of this case, for requiring the district court to have supervised a previous tort case or settlement before it could obtain jurisdiction over CIGA's apportionment claim. *See Harrison v. Pinnacol Assurance*, 107 P.3d 969, 972 (Colo. App.2004) ("apportionment case is a separate cause of action, not an ancillary proceeding to the workers' compensation case"). Because CIGA asserted a separate cause of action under § 10–4–512(1), we conclude it had no need to intervene in Menor's earlier settlement proceedings with St. Paul, and the district court had jurisdiction over CIGA's claim even though it was not actively involved in approving Menor's UM/UIM settlement. *See Colo. Ins. Guar. Ass'n v. Harris, supra.*

Accordingly, the district court had subject matter jurisdiction to determine the amount of CIGA's claimed offset, if any, under § 10–4–512(1) and to apportion economic and noneconomic damages in Menor's settlement with St. Paul.

## II.  C.R.C.P. 12(b)(5)

Given our conclusion that the district court erred in ruling that it did not have subject matter jurisdiction over this case, we now address Menor's alternative argument that CIGA's complaint was nonetheless properly dismissed for failure to state a claim upon which relief could be granted, pursuant to C.R.C.P. 12(b)(5). We conclude the complaint should not be dismissed under that rule.

The purpose of C.R.C.P. 12(b)(5) is to test the legal sufficiency of the com-

plaint, and we review a district court's determination of this matter de novo. *Ashton Props., Ltd. v. Overton, supra*, 107 P.3d at 1018. A C.R.C.P. 12(b)(5) motion is looked upon with disfavor, and a complaint should not be dismissed unless it appears beyond a doubt that a claimant can prove no set of facts in support of the claim which would entitle the claimant to relief. A complaint should not be dismissed for failure to state a claim so long as the claimant is entitled to some relief upon any theory of the law. *Pub. Serv. Co. v. Van Wyk*, 27 P.3d 377, 385–86 (Colo.2001); *Walker v. Van Laningham*, 148 P.3d 391, 394 (Colo.App.2006).

In reviewing the interpretation of a statute, a court should look first to the language of the statute, and the words and phrases therein should be given effect according to their plain and ordinary meaning. *Ball Corp. v. Fisher*, 51 P.3d 1053, 1056 (Colo.App.2001). When a court construes a statute, it should read and consider the statute as a whole and interpret it in a manner giving consistent, harmonious, and sensible effect to all its parts. *Welby Gardens v. Adams County Bd. of Equalization*, 71 P.3d 992, 995 (Colo.2003); *People v. Andrews*, 871 P.2d 1199, 1201 (Colo.1994). In doing so, a court should not interpret or render part of the statute either meaningless or absurd. *Reg'l Transp. Dist. v. Lopez*, 916 P.2d 1187, 1192 (Colo.1996); *People v. Bostelman*, 141 P.3d 891, 893 (Colo.App.2005)(*cert. granted* Aug. 28, 2006).

### A. Exclusion Under UM/UIM Policy

Menor contends that, as a matter of law, because the terms of the St. Paul UM/UIM insurance policy specifically exclude losses covered by workers' compensation benefits, no duplication of recovery could exist under § 10–4–512(1), and thus, CIGA is not entitled to reduce its payments to him under the statute. We disagree.

In deciding whether to dismiss a complaint under C.R.C.P. 12(b)(5), the court may consider only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings, and matters of which the court may take

judicial notice. *Walker v. Van Laningham, supra*, 148 P.3d at 397.

Here, CIGA's complaint specifically referenced the St. Paul UM/UIM insurance policy, Menor's district court complaint against St. Paul, and the settlement agreement.

Section 10–4–512(1) provides:

> Any person having a claim against his insurer under any provision in his insurance policy which is also a covered claim shall be required to exhaust first his right under such policy. Any amount payable on a covered claim under this part 5 shall be reduced by the amount of such recovery under the claimant's insurance policy.

The dispute here is whether the amount recovered by Menor under the St. Paul policy duplicated any part of the workers' compensation benefits due from CIGA. The parties do not dispute that economic losses would be a "covered claim" under the Act, while noneconomic losses (such as pain and suffering) would not be, because such damages are not covered by workers' compensation benefits. *See Reliance Ins. Co. v. Blackford*, 100 P.3d 578, 580 (Colo.App.2004)(benefits provided to an injured employee pursuant to the Workers' Compensation Act include medical expenses, vocational rehabilitation, and disability payments as compensation for lost wages, but workers' compensation does not provide compensation for noneconomic damages, such as pain and suffering).

Menor contends that a provision in the St. Paul policy excludes any payment for losses covered under workers' compensation. The precise language of that exclusion provides: "Workers' compensation. We won't cover any obligation that the protected person has under a workers' compensation, disability benefits or unemployment compensation law, or any similar law."

Menor argues that this exclusion in the policy applies here, such that, as a matter of law, he could not have received a double recovery from the settlement with St. Paul. However, we conclude that the exclusion is not, in itself, dispositive as to whether Menor received a double recovery.

The issue of whether St. Paul invoked this exclusion in its negotiations with Menor was not before the trial court, nor is it properly before us on appeal. There could be reasons, unknown to us, why St. Paul might not have invoked the exclusion. Even if it invoked the exclusion, however, it is possible that St. Paul could have paid Menor for elements of damage that might also have been compensable under the Fremont workers' compensation policy, and as a result, CIGA might be entitled to a setoff under § 10–4–512(1). Indeed, Menor's district court complaint against St. Paul specifically alleged both economic and noneconomic damages. In our view, none of these matters can be disposed of as a matter of law, and they are more properly the subject of factual determinations to be made by the district court on remand.

Accordingly, we conclude that the case must be remanded to the district court to conduct a hearing to evaluate and apportion the benefits, as between economic and noneconomic losses, recovered by Menor under his settlement with St. Paul.

### B. Applicability of Subrogation Rights Under § 8–4–203

Menor contends in the alternative that CIGA, in assuming the obligations of Fremont pursuant to § 10–4–508(1), C.R.S.2006, is barred under § 8–41–203(1)(b), C.R.S.2006, and the cases interpreting it, from a subrogation recovery against proceeds of UM/ UIM insurance, and that the provisions of § 10–4–512(1) are inapplicable under the circumstances of this case. We disagree.

Section 8–41–203(1)(b) provides that if an employee who has been injured by the negligence of a third party elects to take workers' compensation benefits, the payment of compensation shall operate as an assignment to the workers' compensation insurer of the employee's cause of action against "such other person." *State Comp. Ins. Fund v. Gulf Ins. Co.*, 628 P.2d 182, 183 (Colo.App.1981). Therefore, § 8–41–203 establishes the workers' compensation insurer's statutory subrogation remedy against a tortfeasor.

■■■ However, a UM/UIM insurer is not a third-party tortfeasor within the pur-

view of § 8–41–203. *See McMichael v. Aetna Ins. Co.*, 878 P.2d 61, 64 (Colo.App.1994), *aff'd*, 906 P.2d 92 (Colo.1995); *State Comp. Ins. Fund v. Commercial Union Ins. Co.*, 631 P.2d 1168, 1169 (Colo.App.1981). The liability of a UM/UIM insurer to the injured party is contractual, and the workers' compensation insurer does not become a third-party beneficiary under the contract. *McMichael v. Aetna Ins. Co.*, 878 P.2d at 64; *State Comp. Ins. Fund v. Gulf Ins. Co.*, *supra*, 628 P.2d at 184; *State Comp. Ins. Fund v. Commercial Ins. Co.*, *supra*, 631 P.2d at 1169. The UM/UIM insurer does not become the alter ego of the tortfeasor by virtue of providing protection to the insured for injuries caused by the tortfeasor. *State Comp. Ins. Fund v. Gulf Ins. Co.*, *supra*, 628 P.2d at 184.

■■■ Under § 8–41–203, Menor was entitled to recover benefits under both workers' compensation and the St. Paul UM/UIM policy. *See McMichael v. Aetna Ins. Co.*, *supra*, 878 P.2d at 64. Because § 8–41–203 defines the rights of a workers' compensation insurer against a tortfeasor, and the UM/UIM insurer does not step into the shoes of the tortfeasor, a workers' compensation insurer does not have subrogation rights against UM/UIM insurance benefits. Accordingly, we agree with Menor that Fremont did not have subrogation rights against the benefits paid by the St. Paul policy.

■■■ However, we disagree with Menor's contention that § 8–41–203 similarly limits CIGA's ability to assert its claim for relief under § 10–4–512(1) in this case. Rather, we agree with CIGA's contention that its right to reduce the amount of its obligation to Menor is derived not from its assumption of the duties and obligations of Fremont, but from the Act, which is CIGA's own enabling statute.

The Act encompasses workers' compensation insurance, automobile insurance, and various types of "other insurance." *See* § 10–4–506, C.R.S.2006.

The purposes of the Act, in pertinent part, are "to provide a mechanism for the payment of covered claims under certain insurance policies, to avoid excessive delay in payment and financial loss to claimants or policyhold-

ers because of the insolvency of an insurer ... and to provide an association to assess the cost of such protection among insurers." Section 10–4–502, C.R.S.2006. Further, § 10–4–505, C.R.S.2006, directs that the Act "shall be liberally construed to effect the purposes enumerated in section 10–4–502, which section shall constitute an aid and guide to interpretation."

In addition to the nonduplication of recovery provision in § 10–4–512(1), which was enacted to avoid windfall or duplicate recoveries, other sections of the Act address the problem of conserving resources to protect the financial stability of CIGA. *See Colo. Ins. Guar. Ass'n v. Harris, supra,* 827 P.2d at 1141. For example, a "covered claim" under the Act "does not include any first-party claim by an insured whose net worth exceeds ten million dollars." Section 10–4–503(4), C.R.S.2006. Section 10–4–508(1)(a), C.R.S. 2006, provides that CIGA shall "[b]e obligated to the extent of the covered claims existing prior to a determination of insolvency ... but such obligation shall include only that amount of each covered claim which is in excess of one hundred dollars and is less than one hundred thousand dollars," excluding workers' compensation claims. Section 10–4–508.5, C.R.S.2006, addresses the upper limits of CIGA's total liabilities and how payments may be allocated between claimants under certain circumstances. Section 10–4–511(4), C.R.S.2006, provides that CIGA can recover the amount of any covered claim paid for liability obligations incurred by an insured whose net worth is over $25 million. We conclude that these limitations of CIGA's obligations all further the purposes of the Act by ensuring that CIGA's resources are equitably distributed among claimants or policyholders.

Section 10–4–512(1) does not address an injured party's rights against a tortfeasor, but rather an injured party's claim against his or her own insurer for any type of insurance that is also a covered claim under the Act, and is intended to further the purposes of the Act by ensuring nonduplication of recovery. We thus conclude that, although workers' compensation insurers may have no right of subrogation against UM/UIM insur-

ance payments pursuant to § 8–41–203, this rule has no application where CIGA seeks to assert its right of nonduplication of recovery under § 10–4–512(1) with respect to any recovery by an injured party against his or her insurer that is also a covered claim under the Act, including claims against a UM/UIM insurer such as St. Paul.

We thus reject Menor's contention that, because CIGA assumed the obligations of Fremont upon its insolvency, the subrogation limitations in § 8–41–203 and the cases interpreting it, *see McMichael v. Aetna Ins. Co., supra; State Comp. Ins. Fund v. Gulf Ins. Co., supra; State Comp. Ins. Fund v. Commercial Ins. Co., supra,* preclude CIGA as a matter of law from proceeding under § 10–4–512(1).

When an insurance company is insolvent, CIGA shall "[b]e deemed the insurer to the extent of its obligation on the covered claims and to such extent shall have all rights, duties, and obligations of the insolvent insurer as if the insurer had not become insolvent." Section 10–4–508(1)(b), C.R.S.2006. Menor argues that because Fremont would be barred from a right of subrogation against the UM/UIM insurer, CIGA is as well, because it is deemed to stand in the shoes of Fremont. We disagree.

In our view, § 10–4–508(1)(b) is properly interpreted to mean that CIGA is deemed to be the insurer to the extent of its obligation on covered claims, subject to the purposes and other provisions of the Act. *See Fontenot v. Haight,* 764 P.2d 378, 379 (Colo.App.1988) (§ 10–4–508(1) places CIGA in the stead of an insolvent insurer only to the extent that CIGA itself is statutorily obligated on a covered claim). As discussed above, various provisions of the Act, including § 10–4–512(1), further its purposes by conserving the resources available to CIGA to pay claimants and policyholders. Thus, as well as being deemed to be the insurer to the extent of its obligation on the covered claims, CIGA is limited by other provisions of the Act, such as the nonduplication of recovery provision in § 10–4–512. Any other interpretation would create the anomalous result that every time CIGA assumed the obligations of an insolvent insurer, § 10–4–508(1)(b) would auto-

matically release CIGA from all other limitations imposed in the Act and eliminate all other rights granted to CIGA under the Act, including its rights under § 10–4–512. Because CIGA's regular function is to assume the obligations of insolvent insurers, the non-duplication of recovery provision and other limiting provisions would simply be meaningless. Instead, we conclude that CIGA assumed Fremont's obligations to pay Menor's workers' compensation benefits, subject to any other rights and obligations set forth in the Act, such as the nonduplication of recovery provision of § 10–4–512(1). *See Fontenot v. Haight, supra.*

Further, the Act, including §§ 10–4–508(1)(b) and 10–4–512(1), is modeled after the Post–Assessment Property and Liability Insurance Guaranty Association Model Act, as proposed by the National Association of Insurance Commissioners. The Model Act has been adopted in most states, and courts in numerous states have recognized the policy concerns discussed above and have reached a similar conclusion regarding the interplay between their state's version of §§ 10–4–508 and 10–4–512. For example, in *Strickler v. Desai,* 571 Pa. 621, 813 A.2d 650 (2002), the Pennsylvania Supreme Court held:

> [T]he Act was intended "to give a measure of protection to policyholders and claimants who are faced with financial loss because of the insolvency of certain carriers of property and casualty insurance." It was not designed to pay all claims regardless of whether there are other sources of recovery. The Association is a source of "last resort." Member insurers pay assessments to the Association, derived from premiums of policyholders. Although [insureds] correctly point out that a purpose of the fund is to provide a source of recovery of covered claims when an insurer becomes insolvent, the fund should be reserved to pay insureds of insolvent insurers who have not recovered the same damages from another source. The requirement that a previous insurance recovery reduce the amount owed by the Association serves to protect the limited fund from depletion when the insured has already obtained a recovery for the loss.

*Strickler v. Desai, supra,* 813 A.2d at 656 (citations omitted) (quoting *Bethea v. Forbes,* 519 Pa. 422, 548 A.2d 1215, 1216, 1218 (1988)); *see Ill. Ins. Guar. Fund v. Farmland Mut. Ins. Co.,* 274 Ill.App.3d 671, 210 Ill.Dec. 661, 653 N.E.2d 856, 858 (1995)(although the Fund is deemed to be the insolvent insurer, "its role is 'subject to the limitations' of the Act"); *Shaler v. Toms River Obstetrics & Gynecology Assocs.,* 383 N.J.Super. 650, 893 A.2d 53, 57 (App.Div.2006) (Association's obligation under New Jersey's version of the Act is limited to the payment of covered claims, and it is not a "panacea for all problems caused by insurance company insolvencies" (quoting *Carpenter Tech. Corp. v. Admiral Ins. Co.,* 172 N.J. 504, 800 A.2d 54, 66 (2002)) ); *Jendrzejewski v. Allstate Ins. Co.,* 341 N.J.Super. 460, 775 A.2d 583, 585 (App.Div.2001) (the evident purpose of New Jersey's version of § 10–4–512 was to conserve the assets of the Fund by shielding it from liability for the obligations of insolvent insurers where there is other insurance covering the same claim that is covered by the insolvent insurer's policy); *Blackwell v. Pa. Ins. Guar. Assoc.,* 390 Pa.Super. 31, 567 A.2d 1103, 1106 (1989) (not only should a claimant not be placed in a better position, "it is equally clear that the legislature did *not* intend, in enacting the Insurance Guaranty Act, that in all cases a claimant would be placed in the *same* position he would have been in had the insurance company remained solvent"); *Va. Prop. & Cas. Ins. Guar. Ass'n v. Int'l Ins. Co.,* 238 Va. 702, 385 S.E.2d 614, 616 (1989) (rights and obligations of the Association under Virginia's version of the Act are not in all respects identical to those of the insolvent insurer, because Virginia's version of § 10–4–508 "must be read in conjunction with other sections of the Act," which further impose limitations on the obligations of the Association, including the offset provision for duplications of recovery).

For similar reasons, we also reject Menor's argument that, because of § 10–4–508(1), as a matter of law, CIGA is bound by Fremont's failure to assert a right of subrogation in its FAL and is thus precluded from asserting its rights under § 10–4–512(1). First, the FAL is not in the record before us, and any issues

concerning the effect of that document should not be resolved on a C.R.C.P. 12(b)(5) motion, but should be determined by the district court on remand. Second, as discussed above, Fremont's subrogation rights under § 8–41–203 (or lack thereof) are not applicable here, where CIGA's claim is asserted under its specific statutory right under § 10–4–512(1) to avoid a duplicative recovery. Nevertheless, we acknowledge that, on remand, Menor may have certain fact-specific equitable defenses to CIGA's claim based on Fremont's FAL. In that regard, we note the parties have not addressed whether the ALJ's rulings on certain of these equitable defenses would be subject to res judicata or collateral estoppel, and thus, we do not consider that issue on appeal.

Accordingly, we conclude CIGA did not fail to state a claim against Menor under § 10–4–512(1). Therefore, we reject Menor's contention that the judgment of the district court should be affirmed on that basis.

### III. Attorney Fees

Menor seeks an award of attorney fees pursuant to § 13–17–102, C.R.S.2006 (providing for such an award where an action, including an appeal, lacks substantial justification). Because we reverse the judgment, we necessarily conclude that CIGA's appeal does not lack substantial justification, and we thus deny Menor's request for fees.

The judgment of the district court is reversed, and the case is remanded for further proceedings consistent with this opinion.

Judge TERRY concurs.

Judge WEBB concurs in part and dissents in part.

Judge WEBB concurring in part and dissenting in part.

In my view, CIGA's complaint asserting a setoff against Menor's uninsured/ underinsured motorist (UM/UIM) settlement proceeds should have been dismissed under C.R.C.P. 12(b)(5) because § 10–4–508(1)(b), C.R.S.2006, provides that CIGA steps into the shoes of the insolvent workers' compensation carrier. Even if those proceeds cover some of Menor's economic loss, and thus duplicate his workers' compensation claim against that carrier, I disagree with the majority's reliance on § 10–4–512(1), C.R.S. 2006, to afford CIGA a setoff right that was never exercised by, and more importantly under settled law interpreting § 8–41–203, C.R.S.2006, would not have been available to, the insolvent carrier whose duties CIGA has assumed. Accordingly, and with respect, I dissent from part II.B of the majority's opinion.

The majority opinion accurately sets forth the facts, which are largely undisputed, as well as the applicable statutes and relevant Colorado case law.

Under § 10–4–508(1)(b), read without regard to § 10–4–512(1), CIGA could not expand the insolvent carrier's subrogation rights under § 8–41–203 to reach UM/ UIM benefits. Under § 10–4–512(1), read without regard to § 10–4–508(1)(b), CIGA could exercise broader rights than the insolvent carrier and set off such benefits to the extent they duplicated economic loss under a "covered" workers' compensation claim. Thus, these two provisions conflict.

If the language of a statute conflicts with other provisions, then a court may rely on other factors, such as legislative history, prior law, the consequences of a given construction of the statute, and the purpose of the statutory scheme, to determine the statute's meaning. *See, e.g., Allely v. City of Evans,* 124 P.3d 911, 913 (Colo.App.2005).

I would resolve this conflict by furthering the public policies favoring full enjoyment of UM/UIM benefits and compensation of injured workers, as well as the avowed purpose of the Colorado Insurance Guaranty Association Act (Act), § 10–4–501, et seq., C.R.S. 2006, that claimants not suffer loss because of an insurer's insolvency. *See* § 2–4–203, C.R.S.2006 (in discerning legislative intent, court should consider, inter alia, the consequences of a particular construction and the legislative declaration); *Marquez v. Prudential Prop. & Cas. Ins. Co.,* 620 P.2d 29, 33 (Colo.1980). My reasons follow.

First, to the extent that CIGA sets off proceeds of Menor's UM/UIM settlement

against his workers' compensation benefits, he will receive less than he would have if the insolvent carrier had remained in business and continued to pay those benefits. As a result, Menor will suffer a loss *because of* that insolvency, unless he can reopen his settlement with the UM/UIM carrier. This result contravenes one purpose in the legislative declaration, "to avoid ... financial loss to claimants ... because of the insolvency on an insurer." Section 10–4–502, C.R.S.2006. While the majority notes "the problem of conserving resources to protect the financial stability of CIGA," the legislative declaration does not recognize this concern as counterbalancing any stated purpose of the Act.

Second, the limitations on CIGA's obligations in other sections of the Act, which the majority cites to explain why CIGA's right of setoff under § 10–4–512(1) prevails over the duties of the insolvent carrier that it assumed under § 10–4–508(1)(b), do not persuade me. Most notably, the limitation on "covered claims" over $100,000 in § 10–4–508(1)(a), C.R.S.2006, provides "except that the association shall pay the full amount of any covered claim arising out of workers' compensation policies," and the limitation on CIGA's aggregate liability in § 10–4–508.5(1)(a), C.R.S.2006, similarly provides "except in the case of a claim for benefits under workers' compensation coverage." *Fontenot v. Haight,* 764 P.2d 378 (Colo.App. 1988), cited by the majority, did not involve a workers' compensation policy, and thus I find its discussion of § 10–4–508(1) inapposite here. The limitations based on the net worth of insureds— §§ 10–4–503(4) and 10–4–511(4), C.R.S.2006 ($10 million and $25 million, respectively)—are very unlikely to involve injured workers. Moreover, while these two sections could reduce the contractual obligations of an insolvent insurer, here the insolvent insurer's limited subrogation right, to which CIGA succeeds, is statutory. *See* § 8–41–203.

Third, Colorado cases recognize a strong public policy of compensating claimants to the full extent of UM/UIM coverage. *See, e.g., State Farm Mut. Auto. Ins. Co. v. Brekke,* 105 P.3d 177, 185 (Colo.2004); *De-Herrera v. Sentry Ins. Co.,* 30 P.3d 167, 174

(Colo.2001); *Huizar v. Allstate Ins. Co.,* 952 P.2d 342, 345 (Colo.1998); cf. *Am. Fam. Mut. Ins. Co. v. Murakami,* 169 P.3d 192, 2007 WL 529244 (Colo.App. No. 05CA1472, Feb. 22, 2007)(discerning no public policy violation where statute expressly allowed insurer's setoff). Moreover, "we are directed to liberally construe the [Workers'] Compensation Act in order to effectuate its humanitarian purpose of assisting injured workers." *Conley v. Indus. Comm'n,* 43 Colo.App. 10, 12, 601 P.2d 648, 650 (1979). Indeed, in my view, the workers' compensation claim exceptions to §§ 10–4–508(1)(a) and 10–4–508.5(1)(a), discussed above, incorporate this policy "of assisting injured workers" into the Act. But if CIGA obtains a setoff under § 10–4–512(1), then Menor loses the benefit of UM/UIM proceeds payable under his settlement with that carrier because he will not receive future workers' compensation benefits acknowledged by the insolvent carrier's FAL.

Fourth, while the majority states that § 10–4–512(1) "was enacted to avoid windfall or duplicate recoveries," the same has been said of § 8–41–203. *See Rains v. Kolberg Mfg. Corp.,* 897 P.2d 845, 847 (Colo.App. 1994); *Rocky Mountain Gen. v. Simon,* 827 P.2d 629, 632 (Colo.App.1992). Yet Colorado case law is uniform that subrogation under § 8–41–203 does not reach UM/UIM proceeds. *See, e.g., McMichael v. Aetna Ins. Co.,* 878 P.2d 61 (Colo.App.1994), *aff'd,* 906 P.2d 92 (Colo.1995). Such proceeds are no more or less a windfall under § 8–41–203 than they are under § 10–4–512(1). Since this interpretation more than a decade ago, the General Assembly has not amended § 8–41–203 to preclude such windfalls, although that section was amended in 2002, 2003, and 2004. *See Tompkins v. DeLeon,* 197 Colo. 569, 571, 595 P.2d 242, 243–44 (1979) (legislature is deemed to have acquiesced in prior judicial interpretation of a statute that the legislature amends without changing the effect of the interpretation).

Finally, CIGA cites no legislative history from Colorado's adoption of the Act that would explain why § 10–4–512(1) should prevail over § 10–4–508(1)(b) in the UM/UIM context.

Courts in other states that have adopted the model act recognize a guaranty association remains bound by a default judgment against, and a settlement entered into by, an insolvent insurer. *See Martino v. Florida Ins. Guar. Ass'n,* 383 So.2d 942, 944 (Fla. Dist.Ct.App.1980) (default judgment); *Borchardt v. Carline,* 617 So.2d 970, 973 (La.Ct. App.1993) (settlement); *DeVane v. Kennedy,* 205 W.Va. 519, 535, 519 S.E.2d 622, 638 (1999).

Further, because of the unique UM/UIM limitation on subrogation in Colorado and Colorado's strong public policy favoring full realization of UM/UIM benefits, I do not consider the out-of-state cases cited by the majority discussing provisions like § 10–4–512(1) as dispositive of CIGA's power to set off such benefits against its obligation to pay a covered workers' compensation claim.

In sum, I recognize the majority's interpretation as reasonable because unlike other provisions of the Act, § 10–4–512(1) creates no exception for workers' compensation claims. But without any guidance from Colorado legislative history, I would hold that CIGA's complaint seeking setoff under § 10–4–512(1) against Menor's UM/UIM settlement proceeds fails to state a claim because CIGA stands in the shoes of the insolvent carrier under § 10–4–508(1)(b), and the insolvent carrier could not have reached those proceeds.