**STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, Plaintiff–Appellee,**

v.

**Barbara FISHER, Defendant–Appellant.**

No. 09–1415.

United States Court of Appeals, Tenth Circuit.

June 14, 2010.

Steven T. Nolan (Joseph R. Winston, Winston Law Firm, Colorado Springs, Colorado with him on the briefs), Steven T. Nolan, P.C.; Colorado Springs, CO, for the Defendant–Appellant.

Marc Levy (Scot C. Kreider with him on the briefs), Levy, Morse & Wheeler, P.C.; Englewood, CO, for the Plaintiff–Appellee.

Before BRISCOE, Chief Judge, HOLLOWAY and HENRY, Circuit Judges.

HENRY, Circuit Judge.

## CERTIFICATION OF A QUESTION OF STATE LAW

This case involves the reach of Colorado's uninsured motorist coverage ("UIM"). *See* Colo.Rev.Stat. § 10–4–609. The uninsured motorist provision of Mr.

Fisher's automobile insurance policy provides:

> We will pay compensatory damages for bodily injury an insured is legally entitled to collect from the owner or driver of an uninsured motor vehicle. The bodily injury must be:
>
> 1. sustained by an insured; and
> 2. caused by an accident that involves the operation, maintenance, or use of an uninsured motor vehicle as a motor vehicle.

Aplt's App. vol. I, at 345 (emphases omitted). This provision is based upon the Colorado Uninsured Motorist Act, which requires insurers to provide coverage against uninsured motorists for injuries "arising out of the ownership, maintenance, or use of a motor vehicle" unless rejected in writing by the insured. Col. Rev.Stat. § 10–4–609(1)(a).

The United States Court of Appeals for the Tenth Circuit, pursuant to 10th Cir. R. 27.1 and Colo.App. R. 21.1, desires to submit to the Colorado Supreme Court a request that the Colorado Supreme Court exercise its discretion to accept the following important certified questions of Colorado law, which may be determinative of this case now pending in this court, and as to which there appears to be no controlling precedent.

Where the definition of "use" is ambiguous in the policy contract, because it is susceptible of more than one construction, one providing coverage and the other limiting coverage; and a reasonably prudent person might understand the term to provide coverage; and when an assailant driving an uninsured motor vehicle (a) chases person covered by an automobile insurance policy, who is also driving a moving vehicle; (b) rams the covered person's vehicle with the uninsured vehicle; (c) fires a shotgun into the covered person's vehicle, injuring two passengers; and (d) emerges from his vehicle and assaults the covered person (who has also emerged from his vehicle):

1. Is the injury resulting from the assault on the covered person an "accident arising out of the ... use of" an uninsured vehicle under *State Farm v. Kastner,* 77 P.3d 1256 (Colo.2003)?

If the injury is an accident arising out of the use of the uninsured vehicle, then:

2. Do the covered person's injuries satisfy the "causal nexus" prong of *Kastner,* 77 P.3d at 1258, which includes inextricably linked events that "flow from" the covered use? *See id.* at 1258, 1264 (citation omitted).

We encourage the Colorado Supreme Court to reformulate the questions as it sees fit.

## I. BACKGROUND

The facts are uncontroverted. On Nov. 5, 2007, Mr. Fisher drove his three friends (Caleb Moore, Jeremy Vialpondo, and Robert Ellsworth) in his 1991 Ford Explorer to the home of Tiffany Howard, who had telephoned and asked for a ride. Ms. Howard was concerned because her ex-boyfriend, Andrew Brown, was apparently watching her house. After Mr. Fisher picked up Ms. Howard, Mr. Brown followed them, driving his uninsured Chevrolet Suburban and chasing them for at least two miles. During the course of the chase, Mr. Brown rammed his Suburban into Mr. Fisher's vehicle several times. He then pulled alongside the car, brandished and fired a shotgun into the car, injuring passenger Mr. Vialpondo. Flying glass also injured passenger Mr. Moore. Mr. Fisher pulled over, and exited the car, evidently trying to get assistance from passing motorists. Mr. Brown had driven past Mr. Fisher's car after the shooting. He turned his Suburban around, stopped, and got out of the car. Thirty-nine seconds after hav-

ing shot Mr. Vialpondo, Mr. Brown shot and killed Mr. Fisher and then himself.

Barbara Fisher, Mr. Fisher's mother, acting on behalf of his estate, submitted a claim for uninsured motorist benefits arising out of the wrongful death of Mr. Fisher as a result of Mr. Brown's conduct. Mr. Vialpondo and Mr. Moore also submitted claims to State Farm, seeking payment of uninsured motorist benefits for the injuries alleged to have been sustained as a result of Mr. Brown's conduct. State Farm filed an action for declaratory judgment and sought summary judgment against Ms. Fisher and the passengers, arguing it had "no duty to compensate [d]efendants under the uninsured/underinsured motorist policies issued to Michael and Barbara Fisher, on the basis that the [d]efendants' injuries were not caused by an accident that involves the operation, maintenance, or use of an uninsured motor vehicle as a motor vehicle." Rec. vol. I, at 27 (Complaint, filed Aug. 8, 2008) (internal quotation marks omitted). The district court denied State Farm's motion for summary judgment with respect to passengers Mr. Vialpondo and Mr. Moore, finding that there was use (transportation) and that a jury should decide whether Mr. "Brown's driving and shooting were sufficiently linked so as not to break the causal chain between use of the car for its ordinary intended purposes and [the passengers'] injuries." Aplt's App. vol. III, at 1293.[1]

State Farm also sought summary judgment with respect to Ms. Fisher, who was proceeding on behalf of her deceased son. The district court concluded that "[w]ith regard to Michael Fisher's injuries, [Mr.] Brown used his vehicle merely [as] a method of transport to the *situs* of the accident, not as an active accessory to his actions in causing those injuries." *Id.* at 1294. In

turn, "[t]he critical causal link between use of the vehicle and the injury as to which recovery is sought was thereby severed." *Id.*

We are asked to determine whether or not a jury should decide if the uninsured motorist provision covers Ms. Fisher's claim under Colorado law.

## II.  DISCUSSION

■ The breadth of uninsured motorist coverage is the subject of much litigation. Colorado's public policy clearly favors the "widespread availability of protection to persons against financial losses caused by financially irresponsible motorists." *Apodaca v. Allstate Ins. Co.*, 232 P.3d 253, 259(Colo.Ct.App. 2009); *see State Farm Mut. Auto. Ins. Co. v. Nissen*, 851 P.2d 165, 169 (Colo.1993) (considering UIM provision and noting that "[t]he legislative directive instructs us to find coverage for the innocent insureds whenever possible"). Undoubtedly, "Colorado cases recognize a strong public policy of compensating claimants to the full extent of UM/UIM coverage." *Colo. Ins. Guar. Ass'n v. Menor*, 166 P.3d 205, 217 (Colo.Ct.App.2007) (Webb, J., concurring in part and dissenting in part) (citing *State Farm Mut. Auto. Ins. Co. v. Brekke*, 105 P.3d 177, 185 (Colo. 2004); *DeHerrera v. Sentry Ins. Co.*, 30 P.3d 167, 174 (Colo.2001); *Huizar v. Allstate Ins. Co.*, 952 P.2d 342, 345 (Colo. 1998)).

Specifically, the Colorado Supreme Court has explained:

The effect of the statute to replace an uninsured or underinsured tortfeasor's automobile liability limits with an innocent injured insured's UM/UIM coverage furthers the public policy declared

---

1. State Farm subsequently settled the claims with respect to Mr. Vialpondo and Mr. Moore, and they are not at issue in this appeal.

by the legislature when it first enacted the statute.... By providing an insured the opportunity to protect against loss, up to policy limits, resulting from the negligent conduct of financially irresponsible motorists, the UM/UIM statute permits an insured "to receive the benefits thereof to the extent necessary for full compensation for loss" sustained by the insured.

*DeHerrera*, 30 P.3d at 174 (quoting *Kral v. Am. Hardware Mut. Ins. Co.*, 784 P.2d 759, 765 (Colo.1989) (citing *Peterman v. State Farm Mut. Auto. Ins. Co.*, 961 P.2d 487, 492 (Colo.1998) ("The purpose of the UM statute is to ensure that individuals injured in an accident will be compensated for their losses even if the other motorist is uninsured."))).

Nevertheless, the scope of UIM coverage is not unlimited. In *Kastner*, the Colorado Supreme Court identified a two-part inquiry that courts must apply in determining whether an accident "arise[s] out of the use or operation of a motor vehicle" such that an uninsured motorist provision offers coverage. 77 P.3d at 1260, 1261–65.

## A. The *Kastner* Inquiry

In *Kastner*, the court first considered "whether [the claimant] was using an insured vehicle in a manner not foreign to its inherent purpose at the time of the accident." 77 P.3d at 1262 (quoting *Aetna Cas. & Sur. Co. v. McMichael*, 906 P.2d 92, 103 (Colo.1995) (alteration in original)). Second, the court considered the causal connection between the use and injury. *Id.* at 1263. Although the claimant need not show proximate causation, he or she must "show something more than a mere 'but for' relation between the use of the vehicle and the injury" as well as "an unbroken causal chain between that use and the injury." *Id.* at 1263, 1264.

In *Kastner*, the defendant, Ms. Kastner, was about to get into her vehicle, parked in a shopping center parking lot, when a man came up to her and asked for directions. As she was answering his inquiry, he brandished a knife and ordered her in the car. She was forced into the front passenger seat of the car, and ordered to put the seat back and as far as possible. The man then entered the driver's side of the car and drove her car from the lot.

He drove to a wooded lot, robbed her of $150, placed the knife blade on her throat, and sexually assaulted her. Though Ms. Kastner attempted to escape, the automatic seatbelts restrained her. After the assault, Ms. Kastner reported the crime immediately.

Ms. Kastner sought coverage from her automobile insurer for her injuries. The UIM insurance portion of her insurance policy language is nearly identical to that at issue here. Because the term "use" was not statutorily defined nor defined in the insurance contract, the court recognized that it would construe the undefined term "use" applying the "basic rules of contract interpretation." *Id.* at 1261. Thus, the court would "construe ambiguities in the insurance contract against the drafter." *Id.* In addition, the Colorado Supreme Court "look[ed] to the intent of the parties at the time of contracting, taking into account any legislative intent that would impact upon the issue." *Id.*

The *Kastner* court concluded:

> Where the intent of the insured is not clear, *McMichael* instructs us to determine the covered "use" by looking at all the factual circumstances, "including the particular characteristics of the vehicle and the intention of [both] parties to the insurance contract." *McMichael*, 906 P.2d at 102. In all cases, however, the "use" in question must inhere in the nature of the insured automobile.

*Id.* (alteration in original).

After reviewing its precedent and relevant treatises, the Colorado Supreme

Court concluded that, although "the term 'use' is broad enough to cover activities 'beyond mere transportation,'" "a passenger vehicle has no obvious inherent use apart from its purpose as a mode of transportation." *Id.* at 1262. Finally, "absent some plain and obvious special purpose, the normal use of the ordinary passenger car is limited to transportation." *Id.* at 1263.

In determining that Ms. Kastner's injuries did not "arise out of" the use of the vehicle, the court held that:

> [u]se of a reclining passenger seat to conceal a kidnapping has little to do with using a car for transportation purposes. Use of a car to get to an isolated area to commit a crime may relate to a vehicle's general transportation purpose, but here it was not concurrent with the injury itself, . . . . Finally, use of the car's seatbelts to restrain a sexual assault victim relates neither to the vehicle's transportation purpose nor to any other "conceivable" or foreseeable use contemplated at the time of contracting for insurance.

*Id.* at 1265–66.

The Colorado Supreme Court next examined the second prong of the test, that is, assuming a covered "use," whether a causal nexus exists between the covered "use" of the vehicle and the victim's injuries. *See id.* at 1266. The court considered Ms. Kastner's argument that her use of the car by opening the car door, created the requisite "but for" connection. The court rejected this argument reasoning that "[a]ll of the other non-uses of the car interrupted any direct flow" between the opening of the car door, and the ensuing trapping and assault. *Id.* at 1266. The court also considered and rejected whether the (1) opening of the door, (2) seat belt restraint, (3) reclining seat, and (4) the driving of the car to the situs of the assault should in the aggregate constitute the causal nexus. The court concluded that such a case-by-case approach would "lead to inconsistent and unfair results." *Id.* The court held that Ms. Kastner's State Farm policy did not cover her injuries.

## B. The Parties' Arguments

In this appeal, Ms. Fisher argues that, under *Kastner*, the fatal assault upon her son arose out of Mr. Brown's use of an uninsured vehicle.

As to the first part of the inquiry, whether Mr. Brown used his vehicle as a mode of transportation in committing the assault, Ms. Fisher contends that "Mr. Brown's actions constituted one ongoing assault from the time Mr. Brown began chasing the Fisher vehicle. This one ongoing assault culminated in the shooting of Mr. Fisher and the suicide of Mr. Brown." Aplt's Br. at 17. Under this reasoning, Mr. Brown's use of the car was "concurrent with [Mr. Fisher's] injury," because Mr. Fisher's injury began when Mr. Brown rammed Mr. Fisher's vehicle, fired his shotgun into Mr. Fisher's vehicle and injured Mr. Fisher's passengers. *Kastner*, 77 P.3d at 1265.

As to the second inquiry, "whether [Mr. Brown's] use [of his vehicle was] causally related to [Mr. Fisher's] injury," Ms. Fisher makes a similar argument. *Id.* at 1263. She contends that "[t]he reason Mr. Fisher stopped his vehicle and got out was because of the shooting at the Fisher vehicle and, more specifically, the shooting of Mr. Vialpondo. This is evidenced by Mr. Fisher immediately stopping his vehicle when Mr. Brown shot into the vehicle, striking Mr. Vialpondo and the undisputed fact Mr. Fisher exited his vehicle to seek help for his injured friend." Aplt's Br. at 18–19.

In support of her contention that both *Kastner* inquiries are satisfied, Ms. Fisher invokes *Cole v. United Services Automobile Association* (*USAA*), 68 P.3d 513

(Colo.Ct.App.2002). In that case, Mr. Cole was a passenger in an insured automobile traveling in Colorado Springs, when another car began to tailgate the insured car. The tailgating car pulled around the insured car on the left, and then the tailgater pulled in front of the insured car and stopped suddenly. The driver of the insured car avoided a collision, but the tailgater then backed his vehicle into the insured car. Both drivers left their vehicles and began to fight, and a passenger from the tailgating car exited the vehicle, opened Mr. Cole's passenger door, and attacked him with fists and a wine bottle.

The *Cole* court determined that the Colorado Supreme Court's interpretation of the term "use" was "broad[ ]": the use must be a conceivable one "that is not foreign to its inherent purpose." 68 P.3d at 515. The court rejected the suggestion that the vehicle's use was merely the transport of the assailant to the scene of the assault and concluded that the "uninsured vehicle was integrally related to the perpetration of the assault" because the car both "impeded the progress of the [insured] vehicle and enabled the passenger of the uninsured vehicle to get out and assault [Mr. Cole]." *Id.* (citing *Cung La v. State Farm Auto. Ins. Co.,* 830 P.2d 1007, 1011 (Colo.1992) and *State Farm v. McMillan,* 925 P.2d 785, 794 (Colo.1996)); *see Kohl v. Union Ins. Co.,* 731 P.2d 134, 136 (Colo.1986) (in considering whether an automobile insurance policy provided coverage where bystanders were shot when the insured was removing a rifle from his jeep's gun rack, the Colorado Supreme Court held that "[t]he transportation of hunters and their weapons to areas where they can pursue their sport is undeniably a conceivable use of a four-wheel-drive vehicle").

As to the causal nexus, the *Cole* court determined that "the fact that the assailant left the uninsured vehicle before assaulting [Mr. Cole] does not sever the causal connection between plaintiff's injuries and the uninsured vehicle." *Id.* (citing *Metro Prop. & Cas. Ins. Co. v. Neubert,* 969 P.2d 733, 735 (Colo.Ct.App.1998) (but for accident arising from the use of the car, insured would not have approached uninsured vehicle and would not have been assaulted by passengers exiting the uninsured vehicle) and *Cung La,* 830 P.2d at 1011 (claimant need not establish that the vehicle was the sole cause of the accident)); *Kohl,* 731 P.2d at 137 (holding that "the evidence is clear that the claimants' injuries were causally related to the use of [the insured's] jeep [because t]he accident occurred while [the insured] was lifting the rifle out of the jeep's gun rack preparatory to unloading the rifle and safely storing it for the journey home").

In response to Mr. Fisher's arguments, State Farm applies *Kastner* differently. In State Farm's view, Mr. Brown's driving of his vehicle before the assault on Mr. Fisher cannot satisfy either the transportation-use standard or the causal-connection standard.

As to transportation use, State Farm maintains that "there is no concurrence between Mr. Brown's transportation use of his vehicle and Michael Fisher's death by gunshot. The injury for which Mr. Fisher is seeking recovery (i.e., the wrongful death of Michael Fisher) indisputably occurred after Mr. Brown had terminated his transportation use of his vehicle, parked, alighted from his vehicle and chased Mr. Fisher on foot." Aple's Br. at 13 (emphases deleted). Moreover, it maintains, "[a]ll of the transportation 'uses' cited by Ms. Fisher that occurred prior to Mr. Brown stopping his vehicle are irrelevant, because there is no claim of injury to Mr. Fisher arising out of Mr. Brown's conduct in ramming the Fisher vehicle, brandishing a

shotgun, or firing a shot into the vehicle that injured Mr. Fisher's passengers." *Id.*

As to the causal connection between use of the vehicle and the injury in question, State Farm makes a similar argument. In its view, there is no inextricable link between the transportation use of Mr. Brown's vehicle and Mr. Fisher's injuries because Mr. Brown got out of his car before he shot Mr. Fisher. Mr. Brown's chasing of Mr. Fisher's car and his firing shots at Mr. Fisher's car while driving might establish a "but for" connection between the use of Mr. Brown's car and the assault on Mr. Fisher. However, State Farm contends, such a but-for connection does not establish the "unbroken causal chain between [the use of a vehicle] and the injury," as required by *Kastner. See* 77 P.3d at 1264.

State Farm further argues that *Cole*— the Colorado Court of Appeals decision invoked by Ms. Fisher—is no longer controlling. State Farm notes that *Cole* preceded *Kastner.* Although *Kastner* did not discuss *Cole*, State Farm argues "that the two-prong framework explicitly enunciated by the *Kastner* court was not (and could not have been) followed by the Court of Appeals in *Cole.*" Aple's Br. at 14. Accordingly, in State Farm's view, even though the assault in *Cole* (which occurred outside a car after it had been stopped) was deemed to have arisen out of the use of a car, the same conclusion does not follow in this post-*Kastner* case.

## C. Application of *Kastner*

◼ As to *Kastner*'s transportation-use standard, the Colorado Supreme Court's decision apparently requires that the use of a vehicle as a mode of transportation must be "concurrent with the injury itself." *Kastner,* 77 P.3d at 1265. However, the Colorado precedent that we have reviewed does not define the term "injury" in a manner that can be clearly applied here.

Thus, we cannot determine whether Mr. Fisher's "injury" began when Mr. Brown chased Mr. Fisher's vehicle and commenced "one ongoing assault," Aplt's Br. at 17, as Ms. Fisher contends, or whether Mr. Fisher's "injury" did not begin until Mr. Brown stopped his car, got out of it, and shot Mr. Fisher, as State Farm contends. Under one view, Ms. Fisher can satisfy *Kastner*'s transportation-use standard and under the other view she cannot.

As to *Kastner*'s causal connection inquiry, the same uncertainty exists. On the one hand, Ms. Fisher plausibly points to the close connection between Mr. Brown's first shots into Mr. Fisher's car, Mr. Brown's stopping his car, and his shooting Mr. Fisher. The Colorado Court of Appeals decision in *Cole* states that "the fact that the assailant left the uninsured vehicle before assaulting [the insured] does not sever the causal connection between plaintiff's injuries and the uninsured vehicle." 68 P.3d at 515. On the other hand, as State Farm observes, *Cole* predates *Kastner.* Moreover, the *Kastner* court held that the use of a car to drive the insured victim to an isolated area lacked the requisite causal connection to the subsequent sexual assault. 77 P.3d at 1265. State Farm makes a plausible argument that this reasoning in *Kastner* suggests a similar lack of a causal connection between Mr. Brown's driving his car and his shooting of Mr. Fisher.

## D. Certification

◼ This court may certify a question of state law to a state Supreme Court *sua sponte. See Kan. Judicial Review v. Stout,* 519 F.3d 1107, 1119–20 (10th Cir. 2008). Here, the questions presented are state-law issues that the Colorado Supreme Court has not addressed since *Kastner.* We recognize the importance of allowing the Colorado Supreme Court to decide questions of state law and policy,

and thus define state law. Moreover, the question of how to interpret a standard uninsured motorist insurance provision clause is a matter of exceptional importance for state insurers and insureds. Because we see the UIM landscape to be fraught with unsettled questions of Colorado law, we respectfully request the Colorado Supreme Court to exercise its discretion to accept the questions we have outlined above.

### III. CONCLUSION

Therefore, the undersigned judge of the panel submits this certification to the Colorado Supreme Court. The Clerk of this court is directed to transmit a copy of this certification to counsel for all parties to the proceedings in this court. The Clerk shall also submit to the Clerk of the Colorado Supreme Court a copy of this certification order, together with copies of the briefs filed in this court, and either the original or a copy of the record as filed in this court by the Clerk of the United States District Court for the District of Colorado. We greatly appreciate the consideration of this request.

This appeal is ordered STAYED pending resolution of the certified question.